UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LINDA GUYDEN,** | : | 3:05cv1652 (WWE) |
|     Plaintiff, | : | |
| v. | : | |
| | : | |
| **AETNA INC.,** | : | |
|     Defendant. | : | |

**RULING ON DEFENDANT'S MOTION TO COMPEL ARBITRATION AND
TO DISMISS FEDERAL PROCEEDINGS,
OR IN THE ALTERNATIVE, TO STAY**

In this action, plaintiff Linda Guyden charges her former employer, defendant Aetna, with retaliatory discharge in violation of the whistleblower provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C.A. § 1514A.  Defendant has moved to compel arbitration and to dismiss the federal proceedings, or in the alternative, to stay the proceedings.  For the following reasons, defendant's motion to compel and to dismiss will be granted.

FACTUAL BACKGROUND

In December 2003, Aetna hired Guyden to serve as Director of its Internal Audit Department.

In its employment application, Aetna provided the following notice in bold font above the signature line signed by Guyden: "**I understand that if I am offered employment that begins on or after January 1, 2003, a condition of the offer and my acceptance of that offer is that I agree to use Aetna's mandatory/binding arbitration program rather than the courts to resolve my employment-related legal disputes.**"

1

In its offer letter, Aetna also informed Guyden that any employment-related claim would be subject to mandatory arbitration.

The offer letter stated, in relevant part:

This offer and your acceptance of that offer. . . are contingent upon your agreement to use the Company's mandatory/binding arbitration program rather than the courts to resolve employment-related disputes.  In arbitration, an arbitrator instead of a judge or jury resolves the dispute and the decision of the arbitrator is final and binding. WITH RESPECT TO CLAIMS SUBJECT TO THE ARBITRATION REQUIREMENT, ARBITRATION REPLACES YOUR RIGHT AND THE COMPANY'S RIGHT TO SUE OR PARTICIPATE IN A LAWSUIT.  YOU ARE ADVISED TO, AND MAY TAKE THE OPPORTUNITY TO, OBTAIN LEGAL ADVICE BEFORE FINAL ACCEPTANCE OF THE TERMS OF THIS OFFER.

On April 22, 2004, approximately three months into her employment, Guyden signed a Stock Option Grant Acknowledgement and Acceptance form and an Aetna Performance Unit Award Agreement.   Both of these documents referred to the binding arbitration of employment-related disputes.

The terms of arbitration are contained within the 2000 Stock Incentive Plan, which sets forth that arbitration will be administered by the American Arbitration Association ("AAA") and will be conducted pursuant to the AAA's National Rules for Dispute Resolution.  The arbitrator "shall have the authority to order the same remedies (but no others) as would be available in a court proceeding."  The terms require plaintiff to pay a $100 fee, while Aetna is responsible for the remaining costs and fees of the arbitration.  The agreement also provides for "limited pre-hearing discovery," and affords the parties the right to seek judicial review of the arbitration award.

Within the first seven months of her employment with defendant, plaintiff believed that drastic changes were needed to prevent the company from violating SEC regulation 17 C.F.R. §229.308(a).  Plaintiff alleges that her efforts to prompt these

changes and alert senior Aetna executives to the problems resulted in defendant terminating her employment in violation of the SOX.

Defendant contends that plaintiff was employed by defendant for ten months before she was terminated for performance-related reasons on November 22, 2004.

Plaintiff initially filed her retaliatory termination claim with the Occupational Safety and Health Administration of the U.S. Department of Labor. That agency took no action.

Plaintiff proceeded to file this action in federal court.

## DISCUSSION

Congress enacted the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., to codify a strong national policy in favor of arbitration. Section 2 provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable.

Courts confronted with a dispute between parties subject to arbitration must "construe arbitration clauses as broadly as possible." S.A. Mineracao de Tridade-Samitri v. Utah Int'l. Inc., 745 F.2d 190, 194 (2d Cir. 1984). "Arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." McMahan Securities Co. L.P. v. Forum Capital Markets L.P., 35 F.3d 82, 88 (2d Cir. 1994). In evaluating a motion under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

The Court should consider: 1) whether the parties agreed to arbitrate; 2) whether the scope of the arbitration clause covers the plaintiff's claims; and 3) whether

Congress intended the federal statutory claims asserted to be non-arbitrable.  See Genesco, Inc. v. T. Kakiuchi, 815 F.2d 840, 845 (2d Cir. 1987).

A party should be held to a valid bargain to arbitrate unless Congress has evinced an intention to preclude a waiver of judicial remedies for any statutory rights at issue.  Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1990).  Gilmer instructs that such congressional intention will be manifested in the statutory text, its legislative history, or an "inherent conflict" between arbitration and the statutory purpose.  "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 (1985).  The burden of demonstrating that Congress intended to preclude arbitration rests with the party opposing arbitration.  Bird v. Shearson Lehman/Am. Exp., Inc., 926 F.2d 116, 119 (2d Cir. 1991).

Plaintiff's challenge to arbitration does not touch upon whether a valid contract exists or whether her claim falls within the scope of the arbitration clause.  Plaintiff advances objections grounded upon:  1) the arbitral forum's inherent conflict with the statutory purpose of the SOX; and 2) alleged deficiencies in the procedures afforded by the arbitration agreement.  Plaintiff's arguments are unavailing to circumvention of arbitration.

Inherent Conflict with SOX's Statutory Purpose

In considering whether an inherent conflict exists, the Court first reviews the SOX's statutory purpose and the relevant whistleblower protection provision.  The SOX represents a legislative effort "to improve the quality of and transparency in financial reporting and auditing of public companies."  Carnero v. Boston Scientific Corp., 433

F.3d 1, 9 (1st Cir. 2006).

> Congress enacted the Sarbanes-Oxley Act of 2002 ("Act") in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy. Congress recognized that the problem was an intractable one, and that a number of strong enforcement tools would be necessary–from new regulations and reporting requirements, to expanded oversight, to new criminal provisions. Congress also recognized that for any of these tools to work, the law had to protect whistleblowers from retaliation, because "often, in complex fraud prosecutions, . . . insiders are the only firsthand witnesses to the fraud." S. Rep. No. 107-146, at 10 (2002). Congress therefore made whistleblower protection central to the Act, creating a procedure whereby wrongfully discharged employees can seek redress, including *immediate* preliminary reinstatement, first through the Department of Labor and then through the courts.

<u>Bechtel v. Competitive Technologies, Inc.</u>, 448 F.3d 469, 484 (2d Cir. 2006) (Straub, J. dissenting).

Relevant to this action, Congress provided that an employee of a publicly traded company discharged in retaliation for whistleblowing is entitled to enforceable civil remedies, including reinstatement and backpay. 28 U.S.C. § 1514A. In addition to section 1514A, two other provisions of the SOX provide protection for whistleblowers. Retaliation against individuals providing truthful information to law enforcement officers concerning the commission of any federal offense is subject to criminal sanctions. 18 U.S.C. § 1513(e). The SOX also directs audit committees of the relevant corporations to establish procedures for "receipt, retention, and treatment of complaints" concerning accounting and auditing matters, and "confidential, anonymous submission by employees . . . of concerns regarding questionable accounting or auditing matters." 18 U.S.C. § 78j-1m(4).

Section 1514A was born out of congressional recognition that inconsistent whistleblower protection among the states encouraged a "corporate code of silence" among employees who discover corporate misconduct. See S. Rep. 107-146 (2002), 2002 WL 863249 at *5 (discussing examples of corporate culture, "supported by law," that "discourage[d] employees from reporting fraudulent behavior. . . ."); see also Carnero, 433 F.3d at 12 (citing portions of legislative history evincing objective to provide nationwide protection for whistleblowers). Senator Leahy elaborated upon the need for the whistleblower protection:

> Corporate employees who report fraud are subject to the patchwork and vagaries of current state laws, although most publicly traded companies do business nationwide. Thus, a whistleblowing employee in one state may be far more vulnerable to retaliation than a fellow employee in another state who takes the same actions. . . . The bill does not supplant or replace state law, but sets a national floor for employee protections in the context of publicly traded companies.

S. Rep. 107-146, 2002 WL 863249 at *10, 20.

Specific to arbitrability of a Section 1514A claim, the legislative history reveals that Congress eliminated a provision providing that "[n]o employee may be compelled to adjudicate his or her rights under this section pursuant to an arbitration agreement." See S. 2010, 107th Con. § 7 (2002); S. Rep. 107-146, 2002 WL 863249 at *22.

With no explicit directive against mandatory arbitration within the statutory text or legislative history, plaintiff is left to argue that arbitration will frustrate the legislative intent to place the whistleblower in the role of a private attorney-general who can "put a permanent dent" in the "corporate code of silence." See 148 Cong. Rec. S6436-02, S6437 (2002). Two points fuel plaintiff's assertion of an "inherent conflict": 1) mandatory arbitration of whistleblower disputes will subject employees to the whims of an arbitrator, thereby discouraging employees from reporting misconduct; and 2)

arbitration thwarts the SOX's purpose of promoting corporate transparency since arbitration awards are generally not published.

The Supreme Court has repeatedly upheld enforcement of arbitration agreements over objections that arbitration undermines the role of a private attorney-general as a protector of the public interest.  In Mitsubishi Motors Corp., the Supreme Court, after consideration of the antitrust plaintiff's role "as a private attorney-general who protects the public's interest. . . .", held that nothing in the nature of the federal antitrust laws prohibited parties from arbitrating the relevant antitrust claims. 473 U.S. at 635.  In reasoning that an arbitration agreement should be enforced "so long as the prospective litigant may vindicate its statutory cause of action in the arbitral forum," the Court emphasized the relevant antitrust provision's compensatory or private function as opposed to its deterrent effect. Id. at 636-7.

Following Mitsubishi, the Supreme Court considered an arbitration agreement between brokerage firms and their customers relevant to claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 222 (1987).  The Court, while recognizing the congressional intent "to provide vigorous incentives for plaintiffs to pursue RICO claims that would advance society's fight against organized crime. . . .", held that "[t]he private attorney general role for the typical RICO plaintiff . . . does not support a finding that there is an irreconcilable conflict between arbitration and enforcement of the RICO statute."  Id. at 242; see also Gilmer, 500 U.S. at 26 (no "inherent inconsistency" between arbitration of age discrimination claims and advancement of social policies underlying Age Discrimination in Employment Act).

7

Under this constellation of Supreme Court authority, the Second Circuit has rejected analogous public interest arguments against arbitration.  See  Oldroyd v. Elmira Savings Bank, FSB, 134 F.3d 72, 78 (2d Cir. 1998) ("In examining Oldroyd's contention that the purposes of [Financial Reform, Recovery, and Enforcement Act] FIRREA will be contravened by the use of arbitration, rather than enforcement in federal courts, we find no basis for concluding that FIRREA is distinguishable from ADEA, ERISA and the Sherman Antitrust Act."); Bird v. Shearson Lehman/American Express, Inc., 926 F.2d 116, 121 (2d Cir. 1991) (remedial purpose of Employee Retirement Income Security Act is not compromised by arbitration).

Compelling arbitration of plaintiff's SOX whistleblower claim is consonant with the reasoning of Mitsubishi, McMahon and Gilmore. The legislative history reveals that Congress created provisions of the SOX directed at the encouragement and protection of employees who report corporate misconduct.  At the same time, the SOX's legislative history underscores the compensatory function of section 1514A to relieve whistleblowing employees from the vagaries of state law and to provide such litigants uniform civil remedies.  Such private remedies of reinstatement and backpay can be provided through arbitration.  See Gilmore, 500 U.S. at 32 (rejecting argument that arbitration procedures cannot adequately provide for broad equitable relief); McMahon, 482 U.S. at 232 ("the streamlined procedures of arbitration do not entail any consequential restriction on substantive rights").

Plaintiff faults the arbitration process for subjecting the SOX's whistleblower legislation to the whim of an arbitrator who is not bound to apply the relevant law. However, plaintiff's concern is unfounded. "Such generalized attacks on arbitration res[t] on suspicion of arbitration as a method of weakening the protections afforded in

8

the substantive law to would-be complainants, and as such, they are far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." Gilmer, 500 U.S. at 30 (declining to presume that arbitrators will not be competent, conscientious and impartial) (quotations omitted); see also McMahon, 482 U.S. at 232 (rejecting assumption that arbitrators will not follow the law).  Thus, plaintiff has not sustained her burden to prove an inherent conflict between the SOX and arbitration of her section 1514A claim.

>Inadequate Procedures

Plaintiff challenges the provisions relative to confidentiality of the arbitration decision and limited discovery as set forth in Aetna's Stock Incentive Plan.

Plaintiff complains that the agreement to arbitrate prevents publication of the arbitrator's decision without Aetna's consent and thereby perpetuates the "corporate code of silence" so decried by Congress.  Plaintiff contends that publication of a decision in favor of plaintiff is important for other employees to know that they would be protected from retaliation.

However, as some courts have held, such confidentiality agreements are not so offensive as to render the arbitration agreement invalid, even though such agreements may favor the employer, which will have access to any prior decisions of similar claims. See Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1379 (11th Cir. 2005); Iberia Credit Bureau, Inc. v. Cingular Wireless LLC, 379 F.3d 159, 175 (5th Cir. 2004) ("attack on confidentiality provision is attack on the character of arbitration itself").  The informational advantage to the employer may be diminished by "plaintiffs' lawyers and

arbitration appointing agencies like the AAA , who can scrutinize arbitration awards and accumulate a body of knowledge on a particular company . . . ." See Ting v. AT&T, 319 F.3d 1126, 1152 (9th Cir. 2003).[1]

In this instance, even with the confidentiality provision, arbitration of plaintiff's section 1514A claim will not vitiate the SOX's purpose of encouraging breach of the "corporate code of silence" and informing employees, shareholders and investors of corporate misconduct. Such goals may also be effectuated through section 78j-1m(4) (internal audit procedures relevant to complaints of misconduct) and section 1513e (criminal sanctions for retaliation against whistleblowers). Accordingly, plaintiff has not proved the confidentiality agreement so offensive as to invalidate the agreement to arbitrate.

Plaintiff impugns the adequacy of the arbitration agreement's limited discovery provision. Specifically, she attacks the agreement's limitation upon each party to one deposition of a fact witness and its failure to provide for production requests.

The Supreme Court has recognized that discovery in arbitration "might not be as extensive as in federal courts," yet it has found arbitrable ADEA, RICO and antitrust claims. See Gilmer, 500 U.S. at 31. However, discovery must not be so minimal that plaintiff will not have an opportunity to present her claims. Martin v. SCI Management L.P., 296 F.Supp.2d 462, 468 (S.D.N.Y. 2003). Generally, courts have upheld

---

[1] Ting concerned a private attorney-general action challenging AT&T's Consumer Services Agreement ("CSA") pursuant to California's Consumer Legal Remedies Act and the Unfair Practices Act. The Ninth Circuit, in holding the confidentiality provision at-issue unconscionable, was particularly troubled by AT&T's informational advantage since it would affect seven million Californians, among whom would be potential plaintiffs prevented from obtaining necessary information to present claims of intentional misconduct or unlawful discrimination. Id. The instant confidentiality agreement does not yield an equally broad impact upon potential plaintiffs.

limitations on discovery where the provision applied equally to all parties, provided for additional discovery upon a showing of need, and allowed for effective vindication of the claim at issue.  See Ostroff v. Alterra Healthcare Corp., 433 F.Supp.2d 538, 545 (E.D.Pa. 2006) (collecting cases upholding and voiding arbitration agreements with discovery limitations); Wilks v. The Pep Boys, 241 F.Supp.2d 860, 864 (M.D. Tenn. 2003).  Cases voiding arbitration provisions that curtail discovery have done so where the terms for selection of the arbitrators gave rise to a potentially biased arbitration panel that "would stymie a party's attempt to marshal the evidence to prove or defend a claim." Walker v. Ryan's Family Steak Houses, Inc., 400 F.3d 370, 388 (6th Cir. 2005); cf. Domingo v. Ameriquest Mortgage Co., 70 Fed.Appx. 919, 2003 WL 2167550 (9th Cir. 2003) (holding arbitration agreement unfairly advantaged Ameriquest through terms dictating forum selection, discovery limitation, and dispositive motions).

 Here, the arbitration agreement provides:

> Each [party] may take the deposition of one person and anyone designated by the other as an expert witness . . . . Each party also has the right to submit one set of ten written questions . . .  and to request and obtain all documents on which the other party relies in support of its answers to the written questions.  Additional discovery may be permitted by the arbitrator upon a showing that it is necessary for the party to have a fair opportunity to present a claim or defense.

 In this instance, Aetna's discovery provision appears neutral on its face. However, "employment disputes are often extremely fact-intensive battles between witnesses. . .", and limited discovery comprising one deposition of a fact witness is unlikely to be adequate to advancement of plaintiff's whistleblowing claim.  Penn v. Ryan's Family Steak Houses, Inc., 269 F.3d 753, 757 (7th Cir. 2001).  In effect, defendant will be advantaged by the contract's discovery limitation since the employee

generally requires more discovery than the employer, which generally has ready access to most information relevant to the claim and can often present a defense based only on the deposition of the complaining employee.  Walker v. Ryan's Family Steak Houses, Inc., 289 F.Supp.2d 916, 925 (M.D. Tenn. 2003).  Thus, plaintiff will bear the burden of proving to the arbitrator that additional discovery is necessary.  Nevertheless, absent provisions affording Aetna a favorable bias, the Court cannot indulge in the presumption that the arbitrator will act without equanimity to deny plaintiff's request.  See Gilmer, 500 U.S. at 30.

Plaintiff complains she will be crippled in her ability to obtain third-party discovery because arbitrators do not have the power to subpoena non-party witnesses for depositions.  She argues that depositions of employees from Deloitte & Touche, with whom she discussed irregularities found within Aetna's internal audit reports, are critical to advancement of her proof.

Here, the agreement to arbitrate is subject to the FAA, which confers upon arbitrators the power to "summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document or paper which may be deemed material as evidence in the case. . . ."  9 U.S.C. § 7.  Ample authority supports plaintiff's concern with regard to the arbitrator's lack of subpoena power.  See Hay Group, Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404, 408 (3rd Cir. 2004); COMSAT Corp. v. National Science Foundation, 190 F.3d 269, 271 (4th Cir. 1999); Odfjell ASA v. Celanese AG, 328 F.Supp.2d 505, 507 (S.D.N.Y. 2004).

Although plaintiff may be precluded from taking depositions of non-party witnesses, she may obtain necessary information through a pre-merits hearing before the arbitrator.  Stolt-Nielsen v. Celanese AG, 430 F.3d 567, 578-9 (2d Cir. 2005).  The

Second Circuit has instructed that the "language of Section 7 [of the FAA] is broad" and limited only by the requirement that the witness be summoned to appear before the arbitrator and that the requested evidence be material to the case.  Id.

> Under section 7 of the Federal Arbitration Act, arbitrators have the power to compel a third-party witness to appear with documents before a single arbitrator, who can then adjourn the proceedings.  This gives the arbitration panel the effective ability to require delivery of documents from a third-party in advance, notwithstanding the limitations of section 7 of the FAA.  In many instances, of course, the inconvenience of making such a personal appearance may well prompt the witness to deliver the documents and waive presence.

Hay Group, 360 F.3d at 413 (Chertoff, J. concurring).  Accordingly, arbitration may not present plaintiff with the full range of discovery afforded in federal court.  However, plaintiff may adequately vindicate her rights in the arbitral forum.

## CONCLUSION

For the foregoing reasons, the defendant's motion to compel arbitration [doc. 8-1 and 2] is GRANTED, and defendant's motion to stay [8-3] is DENIED as moot.  The clerk is instructed to close this case.

_____/s/_____
Warren W. Eginton
Senior United States District Judge

Dated this 25th day of September, 2006 at Bridgeport, Connecticut.